Hokan Christenson, Executor of the last Will of Nels Person, Deceased, Appellee, v. Board of Charities of Illinois Conference of Ev. Lutheran Augustana Synod, Appellant.

Gen. No. 33,205.

Opinion filed May 31, 1929.

ANDERSON & ANDERSON, for appellant.

RATHJE, WESEMANN, HINCKLEY & BARNARD, for appellee; FRANCIS E. HINCKLEY, of counsel.

Mr. Presiding Justice Gridley delivered the opinion of the court.

On January 11, 1926, in the superior court of Cook county, plaintiff, as executor, etc., commenced an action in assumpsit against defendant, a charitable organization, to recover the sum of $2,200, which defendant had received from Nels Person during his lifetime, and which in equity and good conscience (as plaintiff claimed) belonged to Person's estate. The declaration consisted of the common counts, to which defendant filed a plea of the general issue and also a plea (afterwards withdrawn) of the statute of limitations of five years. In September, 1928, there was a trial without a jury, resulting in the court finding the issues in plaintiff's favor and assessing his damages at $1,800. Judgment was entered upon the finding against defendant and this appeal followed.

In September, 1921, defendant controlled the "Salem Home for the Aged," located at Joliet, Illinois. J. M. Rydman, a clergyman, was and had been for several years the superintendent of the Home. Nels Person, a native of Sweden and for many years engaged as a general laborer in Chicago, was then living alone in a Chicago hotel. He was 76 years of age, was infirm and recently had become feeble-minded. He had never married and was without any relatives living in the United States. Hokan Christenson, also a native of Sweden and living in Chicago, was a friend of his and they had been acquainted since 1880. In January, 1916, Person had executed a last will by which he devised and bequeathed all of his estate to Christenson and made the latter the executor of the will. In September, 1921, Person's property or estate, consisting of money, was not in excess of $2,500. Arrangements were made whereby Person should be taken to the Home at Joliet, and that he should pay an "admission fee" of $2,000. About September 19, 1921, he

personally signed a partly printed and partly written application for admission to the Home, which he entered on September 21, 1921. When he entered he had paid the $2,000, and he also paid $200 as an advance for any money he might thereafter draw out,—a total of $2,200. He died at the Home on November 9, 1921, having been there for a period of only seven weeks. He had not drawn out any money and the $2,200 which he had paid came into the possession of defendant.

On the trial the application, on page 2 of which are certain "extracts from the rules and regulations" of the Home, was introduced in evidence. It discloses that such answers as were made to the numerous questions were written out by one other than Person. It bears the indorsement: "Approved by board Nov. 8, 1921." This was the day before Person died. The application states that "the undersigned hereby applies for admission as an inmate into the Salem Home for the Aged, Joliet, Ill., and promises, if admitted, to observe and comply with all the laws, rules and regulations now in force, and all other laws, rules and regulations which the management thereof may hereafter adopt." The answer to the question "State condition of your health," is "Good for *his* age." The answer to the question "Are you ready and willing to pay the required admission fee?", is "$2,000." Then follows the statement that "Rules 8, 9, 10 and 11 on page 2 of this instrument have been read and explained to me." No answers were made to the following: "In compliance therewith (said rules) I make the following statement as to property or income of every description, either in my possession at present, or held by others for my benefit, or in which I have an expectant interest," and "Are you willing to transfer to the Board of Charities of the Illinois Conference of the Ev. Lutheran Augustana Synod whatever property you have, at your decease, if not all, how much?"

The rules on page 2 of the application are as follows:

"(1) Before any person can be admitted as a *permanent* inmate of the Home for the Aged, satisfactory proof regarding such person's moral character must accompany a written application for admission, recommended by the church board of a congregation within the Augustana Synod. . . .

"(3) Each applicant, when *first* admitted, shall be *upon probation* for a term of six months. At the expiration of said term the Board of Directors shall, as they deem expedient, *dismiss* or *confirm* the applicant as a regular inmate of the Home.

"(8) Should any of the inmates become dissatisfied, such inmates may be permitted to leave the Home, and to take along all articles which they may have brought with them. If this occurs *within six months* from their admission as permanent inmates, *their entrance fee will be refunded* to them, after deducting a reasonable remuneration for their maintenance during their residence at the Home. The Board in such cases reserves a period of six months from the time such inmates leave the Home in which to refund the residue of the admission fee.

"(9.) Every applicant for admission to the Home shall truthfully answer all questions submitted in the regular application blank, and if after admission, it shall be found that deception has been practiced in the answers so given, such person shall be subject to immediate dismissal from the Home.

"(10) Applicants having money or other property shall be required to deliver or secure the same to the Home, or as much as the Board of Directors may deem just and fair, prior to their admission, and any other money or property they may acquire from any source, while inmates of the Home, shall become the property of the Home, unless exception from this rule has been made in the contract at the time of admission.

"(11) Applicants entitled to pensions or annuities, or who are members of any Endowment Society or Endowment Association, shall be required to assign to the Home, before admission, all benefits resulting from any and all such pensions, annuities and memberships of whatsoever nature or kind, except in special cases, where the Board of Directors may deem right to make exceptions."

According to these rules it is apparent that, when Person entered the Home on September 21, 1921, he did not become a "permanent" inmate thereof, but only was admitted "upon probation for a term of six months"; that at the expiration of this probationary term the Home might either dismiss him or confirm him as a "regular" inmate; that, even after he had become a permanent or regular inmate, he, becoming dissatisfied, would be permitted to leave; and that in such case, if it occurred within six months after his admission as a permanent inmate, the entire fee which he had paid would be refunded to him "after deducting a reasonable remuneration" for his maintenance during his residence at the Home, and he would also be permitted to take away such articles as he had brought with him. He died within seven weeks after his admission upon probation. He never became a permanent or regular inmate. There was no contract made that in consideration of the payment of said admission fee he might remain as a regular or permanent inmate of the Home and be taken care of as long as he lived. And the testimony of Christenson disclosed that, after Person's probationary admission and before his death, Rydman at the Home told Christenson that Person was in "awful bad shape," was "out of his mind," and had to be "locked up in a room," and further said: *"He is on trial.* We cannot keep a man like that. . . . If he don't do better we will have to turn him over to some other place." Rydman testified

that he "could not recall" making these statements but that he "would not say" whether he did or not. Rydman further testified that the minutes of the executive committee of defendant, dated November 8, 1921 (the day before Person died), disclosed the following entry, written by its secretary: "Nels Person was admitted September 19, 1921. Committee approved the action by the Joliet members. Person paid $2000." It further appeared that on the same day (November 8) Rydman wrote a letter to Christenson to the effect that Person was in a very serious condition, that he had some internal sickness, was very feeble, etc. Rydman further testified that Person's funeral expenses amounted to "exactly $300," which were paid by defendant. When asked by the trial court to express his opinion as to what would be a reasonable amount per week for taking care of Person while he was in the Home, he replied: "We assumed the responsibility of the care of this old gentleman. We did it with the understanding that this money was to carry him through, and we took a chance on it. In view of the developments, I do not wish to commit myself as to what I think." Being further asked by the court if he had had any experience where old people are in the Home for a few weeks and then leave, he replied that there had been such cases and that "we charge them from one dollar a day up."

It further appeared from the evidence that shortly after Person's death Christenson, by a firm of attorneys, applied to the probate court of Cook county for the probate of Person's said will and the appointment of Christenson as executor, and that on November 21, 1921, said attorneys wrote the Salem Home, stating the fact of the application and requesting that it forward to them a statement "covering your expenses in the matter, what amount Mr. Person paid you, and what amount of money he had in his posses-

sion when he entered the Home." To this letter the Home, by Rydman, replied on November 25: "Mr. Nels Person was admitted to the Salem Home in the regular way upon turning over to the institution $2,000 for maintenance and $200 for benefit of himself as needed. *The Salem Home has no money belonging to Nels Person.*" On December 5, 1921, replying to said attorneys' written request for a copy of the "conditions, rules and regulations which govern the admission of inmates," Rydman wrote: "Am enclosing a brief extract of the conditions for admission. Persons not members of our or any church are admitted as well, —but not for less than $1,000. Persons of means are required to pay in the same manner as church members, rule 10 and 11. Most frequently we are offered a certain amount and after investigation either reject or accept the applicant. This was the case with Nels Person." On January 23, 1922, Person's will was admitted to probate and letters testamentary issued to Christenson, as executor.

The trial court, in making the finding in plaintiff's favor of $1,800, stated in substance that the amount which Person had paid when he entered the Home was admitted to be $2,200; that, in view of the short period of time he had been there before his death, the rules and regulations of the Home in force at the time of his probationary admission, his written application, etc., defendant could not in equity and good conscience retain all of said sum; but that defendant should be allowed to retain the sum of $400, namely, the $300 which the evidence showed defendant had expended for Person's funeral expenses and $100 for Person's board and maintenance during his residence at the Home. This amount of $100 is at the rate of about two dollars per day,—it appearing that Person prior to his death had been in the Home about seven weeks, or forty-nine days. We are of the opinion that the court's finding,

and the judgment thereon, are fully sustained by the evidence, the law and equitable principles, and that the judgment should be affirmed. In this connection the decision in *Evangelical Lutheran Congregation v. Bishop,* 213 Ill. App. 137, where the facts are somewhat similar, may be cited.

One of the contentions of counsel for defendant is that plaintiff's declaration, containing only the common counts, is insufficient to sustain the judgment. We cannot agree with the contention. In *Wilson v. Turner,* 164 Ill. 398, 403, it is said: ''An action for money had and received will lie whenever one person has received money which, in justice, belongs to another, and which, in justice and right, should be returned.'' (See also, *Allen v. Stenger,* 74 Ill. 119, 121; *Highway Com'rs v. City of Bloomington,* 253 Ill. 164, 174; *National Malleable Castings Co. v. Iroquois Steel & Iron Co.,* 333 Ill. 588, 595.) In the case last cited it is further said: ''Although the action is in form *ex contractu,* the alleged contract is purely fictitious and the right of recovery is governed by principles of equity and no privity of contract is necessary. The action may be maintained in all cases where one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not to retain it and which *ex aequo et bono* belongs to another.''

And we do not think that under the evidence there is any merit in defendant's counsels' further contention that the right in Person (after he had signed said application and entered the Home) to renounce the contract and leave the Home and get back the money he had paid (less proper deductions), was his *personal* right, which he did not exercise before his death, and one which could not be exercised by the representative of his estate or a creditor or any other person. We think that counsel, in making the contention, lose sight

of the facts that Person was only admitted to the Home on probation and that under the contract at the end of the probationary period he might have been dismissed from the Home by its action, in which event he would have been entitled to the return of the money which he had paid, less proper deductions.

Plaintiff has here assigned cross-errors. His counsel contend (1) that the court erred in allowing to defendant $300 which it disbursed for Person's funeral expenses; (2) that the allowance to defendant of $100 for Person's board and maintenance prior to his death is excessive; and (3) that interest should have been allowed on the $2,200 from November 21, 1921, because of a "vexatious delay in payment." We do not think that there is any merit in these contentions. While it may be true, as argued, that defendant acted as a mere volunteer in paying the funeral expenses and that the amount paid therefor is large, still the uncontradicted testimony disclosed that defendant in good faith paid such amount for such expenses. And we do not think that an allowance of two dollars per day for Person's board and maintenance while he was living in the Home can be considered as excessive. And clearly this is not such a case as warrants the allowance of interest on the $1,800, because of it being "withheld by an unreasonable and vexatious delay of payment," as mentioned in section 2 of the Interest Act, Cahill's St. ch. 74, ¶ 2.

Our conclusion is that the judgment appealed from should be affirmed and it is so ordered.

*Affirmed.*

SCANLAN and BARNES, JJ., concur.